### UNITED STATES of America, Plaintiff,

### v.

### George JUNG, et al., Defendants.

#### Crim. No. 83-154.

United States District Court,
D. Massachusetts.

Aug. 16, 1983.

Wendy Gershengorn, Asst. Federal Defender, Boston, Mass., for Jung.

James F. Dinmeen, U.S. Atty., Boston, Mass., for U.S.

Andrej Thomas Strakis, Boston, Mass., for Alvarez.

Robert Silver, Newton Centre, Mass., for Tapanes.

## MEMORANDUM AND ORDER

CAFFREY, Chief Judge.

This matter came before the Court on a motion of defendants to suppress the use as evidence of a gun taken by law enforcement officers from room 124 of the Howard Johnson's Motor Lodge located in Kingston, Massachusetts. After a hearing at which 12 witnesses testified, I find and rule as follows.

State Police Officer William Gorman who was acting in a bewhiskered undercover capacity, assisted by an informant, Bart Galloway, entered into negotiations with defendants for the sale by defendants to Gorman of approximately two pounds of cocaine for an agreed price of $50,000. The transaction was scheduled to take place in room 124 of the motor lodge in the late afternoon of May 25, 1983.

A few hours prior to the officers entry into the room and the arrests of defendants at gun point, a meeting was held at the Kingston, Massachusetts Police Station to plan the arrests. At that meeting there were representatives from the Massachusetts State Police, the Kingston Police Department, the Barnstable County Sheriffs Office, the Bureau of Alcohol, Tobacco, and Firearms, and the Drug Enforcement Agency of the United States Department of Justice.

Just as the transactions were about to be consummated, in response to a prearranged signal, four state police officers, two federal agents, two members of the Kingston Police Department, and a Barnstable County Deputy Sheriff all burst into the room, some with drawn handguns. Sergeant Ballinger of the Kingston Police Department, who wore a bulletproof vest, was the first officer into the room. He yelled "police-freeze" as he entered and defendants complied with his order. In a matter of two to three minutes, the three defendants were placed under arrest, handcuffed, and removed from the room and the informant and the undercover police officer also were placed under an apparent arrest and removed from the room. Witnesses testified that when the law enforcement personnel burst into the room, their presence plus the presence of the three defendants, the informant, and the undercover police officer, meant that there were 14 or 15 people in that normal size motel room. This produced a chaotic, fast moving situation, reminiscent of the crowded state room scene from the old Marx Brothers movie.

At the hearing the testimony of the various witnesses produced minor discrepancies as to which individual was located precisely where within the room. Given the fact that everything happened within two to three minutes, and given the number of people moving around, the absence of discrepancies as to who was where would have been practically conclusive evidence of "rigged" testimony. This Court would not expect 10

to 12 police officers bursting into a room *seriatim* brandishing guns to have identical or photographic memories of just who was where, given the fact that some people were sitting, some were standing, some were lying on the floor, some were wielding guns and some were being handcuffed and taken out of the room.

Special Agent Offringa of the Bureau of Alcohol, Tobacco, and Firearms testified, as did other law enforcement witnesses that at the meeting in the Kingston Police Department the arresting team was led to believe that the defendants might be armed to protect their "interests." Indeed, many of the police witnesses testified that in a narcotics transaction of the type involved here, one must anticipate the use of firearms. Given this situation, I find that upon entering the room, Agent Offringa lifted one corner of a partially opened suitcase which was on a dresser or vanity on the left side of the room to see if any weapon was located under the suitcase, and I find that when he did so he felt a weight shift caused by the movement of a weapon inside the suitcase. I find that at this point the officers opted to secure a search warrant for the suitcase and that no law enforcement officers searched the suitcase until a warrant was procured and returned to the room. I find that given the limited size of the room, and the testimony summarized above, that it was reasonable and legal for Agent Offringa to lift the suitcase to determine, for the safety of all the arresting officers, whether or not there was a weapon under the suitcase which could have been grabbed by a defendant, even a handcuffed defendant, had it been present. I further find that the suitcase lifted by Agent Offringa was in an "area into which an arrestee might reach in order to grab a weapon ...", *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981); *quoting Chimel v. California,* 395 U.S. 752 at 763, 89 S.Ct. 2034 at 2040, 23 L.Ed.2d 685.

On the basis of the foregoing, I rule that no illegal search and seizure led to the discovery of the firearm which was properly seized under the authority of the search warrant by the officers. Accordingly, the motion to suppress the evidence should be, and hereby is, denied.